[No. 80572-5.   En Banc.]
Argued October 28, 2008.     Decided April 14, 2011.

MARTIN SCHNALL ET AL., *Individually and on Behalf of All Members of the Class of Persons Similarly Situated, Respondents*, v. AT&T WIRELESS SERVICES, INC., *Petitioner*.

---

*Michael E. Kipling* (of *Kipling Law Group PLLC*), for petitioner.

*Daniel F. Johnson* and *David E. Breskin* (of *Breskin Johnson & Townsend PLLC*); and *William W. Houck*, for respondents.

*Stephen M. Rummage* and *Paul J. Lawrence* on behalf of Amazon.com, Clearwire Corporation, Holland America Line Inc., Microsoft Corporation, and T-Mobile USA Inc., amici curiae.

*Seth L. Cooper* and *Micah L. Balasbas* on behalf of American Legislative Exchange Council, amicus curiae.

*Robert M. McKenna, Attorney General,* and *Shannon E. Smith, Senior Counsel,* on behalf of the Office of the Attorney General, amicus curiae.

*Stephen M. Rummage, Fred B. Burnside,* and *Robin S. Conrad* on behalf of Chamber of Commerce of the United States of America, amicus curiae.

*George M. Ahrend* and *Bryan P. Harnetiaux* on behalf of Washington State Association for Justice Foundation, amicus curiae.

¶1 MADSEN, C.J. — Plaintiffs challenge AT&T Wireless Services Inc.'s billing practices. They sought nationwide class certification, which was denied. The Court of Appeals reversed. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.[1]

## FACTS

¶2 Customers of AT&T filed a nationwide class action alleging the company misled consumers when it billed them for a charge that was not included in advertised monthly rates and was not described clearly in billing statements. The Federal Communications Commission (FCC) requires telecommunications companies like AT&T to contribute to the Universal Service Fund (USF), a fund created by the Telecommunications Act of 1996 that subsidizes phone and Internet service to low-income and rural areas. The FCC expressly permits companies to recover USF contributions from customers. AT&T recovered its contributions from customers by charging a Universal Connectivity Charge (UCC), listed in customer agreements as either "Other Charges & Credits" or "Taxes, Surcharges & Regulatory Fees." Pet. for Review at 3. Named plaintiff Martin Schnall claims this categorization of the UCC violates the Washington Consumer Protection Act (CPA), chapter 19.86 RCW, and further, that AT&T violated the terms of its contract by failing to disclose the charge at the time he signed his agreement for wireless service. Schnall further claims AT&T violated the terms of its user contracts by increasing the UCC charge without notice. Schnall sought certification of a nationwide class of all AT&T customers "who have been improperly billed and paid a universal connectivity charge that they did not owe." Clerk's Papers (CP) at 186 (First Am. Class Action Compl.).

---

[1] An opinion in this case was filed at 168 Wn.2d 125, 225 P.3d 929 (2010). The plaintiffs filed a motion for reconsideration. After review, we granted reconsideration and issued an order withdrawing that opinion. We now issue this opinion affirming the Court of Appeals' decision in part, reversing in part, and remanding this case for further proceedings.

¶3 The trial court determined that "individual questions predominated over common questions" and denied class certification on all of Schnall's claims. CP at 417-18 (Mem. Op. Den. Mot. for Class Certification (Mem. Op.) at 1-2). Schnall appealed that decision to Division One of the Court of Appeals, which reversed the trial court and certified the class. *Schnall v. AT&T Wireless Servs., Inc.*, 139 Wn. App. 280, 161 P.3d 395 (2007).

## Standard of Review

¶4 The standard of review is paramount in this case: it is not our place to substitute our judgment for that of the trial court. When this court reviews a trial court's decision to deny class certification, that decision is afforded a substantial amount of deference. "[I]f the record indicates the court properly considered all CR 23 criteria," this court will not disturb its decision. *Nelson v. Appleway Chevrolet, Inc.*, 160 Wn.2d 173, 188, 157 P.3d 847 (2007). "[A] trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds." *Dix v. ICT Grp., Inc.*, 160 Wn.2d 826, 833, 161 P.3d 1016 (2007).

## Enforceability of Choice of Law Clauses

¶5 The parties initially dispute whether the choice of law clauses in the customers' contracts are enforceable. The choice of law clauses in this case require customers to litigate asserted violations of their contract in the respective jurisdiction where they signed the contract. This jurisdiction is often based on the customer's area code.

¶6 We interpret contract provisions to render them enforceable whenever possible. *Patterson v. Bixby*, 58 Wn.2d 454, 459, 364 P.2d 10 (1961). Further, "[w]e generally enforce contract choice of law provisions." *McKee v. AT&T Corp.*, 164 Wn.2d 372, 384, 191 P.3d 845 (2008) (citing *Erwin v. Cotter Health Ctrs., Inc.*, 161 Wn.2d 676, 695-96, 167 P.3d 1112 (2007)). In *Erwin* we applied section 187 of the *Restatement (Second) of Conflict of Laws* (1971) (*Re-*

*statement*) to hold the parties' contractual choice of law provision was effective. Section 187 reads in significant part:

> " '(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> " '(a)   the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> " '(b)   application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.' "

*Erwin*, 161 Wn.2d at 694-95 (quoting *O'Brien v. Shearson Hayden Stone, Inc.*, 90 Wn.2d 680, 685, 586 P.2d 830 (1978), *adhered to on recons.*, 93 Wn.2d 51, 605 P.2d 779 (1980)). To effectively void a choice of law provision, a court must find that the chosen state has no substantial relationship to the parties *or* that the application of the chosen law would be contrary to a fundamental policy of Washington. *Id.* at 698. Further, Washington courts have also adopted the "significant relationship" test in section 145 of the *Restatement*, which gives great weight to the place where the parties' relationship was centered. *Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 580-82, 555 P.2d 997 (1976).

¶7  Other courts have also recognized the importance of the location of the contractual relationship in deciding choice of law problems as they apply to class certification. In *Kelley v. Microsoft Corp.*, 251 F.R.D. 544 (W.D. Wash. 2008), the district court found the most significant contacts to exist in Washington because, in addition to being the location where Microsoft "developed and launched its allegedly deceptive promotional program," "the parties' relation-

ship is not centered in any particular place because the parties *did not contract* with one another." *Id.* at 552 (emphasis added) (citing *Restatement* § 145(2)(b) and (d), and applying Washington state law to class action certification of CPA and contract claims). Though not a class action, in *Kammerer v. Western Gear Corp.*, 96 Wn.2d 416, 423, 635 P.2d 708 (1981), we held that because the parties contracted in California to have California law apply, the choice of law clause should be enforced.

■■ ¶8 The choice of law provisions in this case were mostly based on customers' area codes, not on forums having no substantial relationship to the parties or location of the transaction between them. The customer's area code is left to the discretion of the customer, and this area code often corresponds with the customer's place of residence: in effect, the *customer* selected which forum's law would apply when he requested phone service from AT&T. AT&T should not now be forced to face the enormous cost and complexity presented by a nationwide class action when it conscionably included choice of law provisions in its customers' contracts and the choice of forum is dictated by the consumer. *See generally* 4 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 13:63, at 476 (4th ed. 2002) ("Like all litigation, complex cases are more likely to be settled than tried. The stakes in the case and the cost of pretrial activity increase that likelihood.").

¶9 Schnall presents no valid reason why we should now invalidate the choice of law clause each customer signed when he or she purchased wireless service from AT&T.[2] The trial court did not abuse its discretion when it held that

> [t]here does not seem to be any public policy reason not to enforce the choice of law provision of the agreements in this case. The law of the State associated with the area code will generally be the law of the customer's home state, thereby

---

[2] Among other things, Schnall also fails to explain why application of the "chosen states" law under the choice of law provisions would be contrary to a fundamental policy of this State under *Restatement* § 188(2)(b).

applying to that customer the law with which he or she is most familiar.

CP at 418 (Mem. Op. at 2). Upholding the trial court's decision to deny certification of a *nation*wide class does nothing to prevent persons outside of Washington from filing statewide class actions in each of their respective home states. Indeed, the citizens of California have already filed such a statewide class action. Suppl. Br. of Pet'r AT&T, Ex. A (Order Granting Approval of Form Class Notice, *Randolph v. AT&T Wireless Servs., Inc.*, No. RG05193855 (Alameda County Super. Ct., Cal. Apr. 18, 2008)).

Class Certification of Contract Claims

¶10 Schnall brings two types of claims before the court: one based in contract, the other based on the CPA. The differences between these two types of claims have important implications for analysis of their suitability as class action claims. AT&T argues the trial court was correct in deciding that the choice of law clauses in each customer's contract caused individual issues to predominate over common ones.

¶11 As noted above, the choice of law clause in each customer's contract is valid. The trial court held, "Applying the law of the customer's home state to the contract claims in this case makes the contract claims unmanageable." CP at 418 (Mem. Op. at 2) (citing *In re Sch. Asbestos Litig.*, 789 F.2d 996 (3d Cir. 1986); Rory Ryan, *Uncertifiable?: The Current Status of Nationwide State-Law Class Actions*, 54 BAYLOR L. REV. 467 (2002)).

¶12 To validly certify a nationwide class for the contract claims, Schnall must meet the requirements of CR 23(a): numerosity, commonality, typicality, and adequacy of representation. Once those have been met, he must further satisfy the tougher standard of CR 23(b)(3) and prove that common legal and factual issues *predominate* over individual issues and that a class action is an otherwise superior form of adjudication. Factors to be considered by the court when assessing predominance and superiority include

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

CR 23(b)(3). It is "incumbent upon class counsel to prove to the court . . . that there are no significant differences in the various state laws, or if there are variations, that they can be managed by the trial court." 4 CONTE & NEWBERG, *supra*, § 13:36, at 436-37 (citing Arthur R. Miller & David Crump, *Jurisdiction and Choice of Law in Multistate Class Actions after* Phillips Petroleum Co. v. Shutts, 96 YALE L.J. 1, 63-68 (1986)).

¶13  The Court of Appeals held that a "common nucleus of operative facts" predominated, but failed to substantially analyze the issue of predominance, especially in consideration of the potential application of 50 different states' laws. *Schnall*, 139 Wn. App. at 298-99. The Court of Appeals' predominance analysis reads more like a CR 23(a) commonality test: "The common nucleus of facts among all class members on this breach of contract claims *is* . . . . The common legal theory *is*." *Id*. at 299 (emphasis added). Simply stating the existence of commonalities does not prove predominance.[3] The trial court's analysis on this point is more thorough and is clearly supportable under our abuse of discretion standard.

¶14  As the Court of Appeals noted, the trial court "made several findings about the individual issues the contract claim raised." *Id*. at 298. The trial court found that the choice of law clauses, the interpretation of the contract terms, the differences in the materials and information

---

[3] Further, the Court of Appeals relied, in part, on *Pickett v. Holland America Line-Westours, Inc.*, 145 Wn.2d 178, 35 P.3d 351 (2001), and the similarity between the legal theory in this case and the theory in *Pickett* to support its conclusion that common issues predominate. *Schnall*, 139 Wn. App. at 299. However, we have held *Pickett* holds little "precedential value." *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 76, 170 P.3d 10 (2007).

each potential class member received, and the availability of differing affirmative defenses created a predominance of individual issues over common ones. CP at 418-19 (Mem. Op. at 2-3).

¶15 Because CR 23 is identical to its federal counterpart, "cases interpreting the analogous federal provision are highly persuasive." *Schwendeman v. USAA Cas. Ins. Co.*, 116 Wn. App. 9, 19 n.24, 65 P.3d 1 (2003) (citing *Pickett v. Holland Am. Line-Westours, Inc.*, 145 Wn.2d 178, 188, 35 P.3d 351 (2001)). The Court of Appeals reached a conclusion that flies in the face of this "highly persuasive" federal law regarding nationwide class action certification: "[b]ased primarily on the burden of applying multiple states' laws, an *overwhelming number* of federal courts have denied certification of nationwide state-law class actions." Ryan, *supra*, at 470 (emphasis added) (citing *Stirman v. Exxon Corp.*, 280 F.3d 554, 564-66 (5th Cir. 2002); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187, *amended by* 273 F.3d 1266 (9th Cir. 2001); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 678 (7th Cir. 2001); *In re LifeUSA Holding, Inc.*, 242 F.3d 136, 147 (3d Cir. 2001); *Spence v. Glock*, 227 F.3d 308, 316 (5th Cir. 2000); *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1025 (11th Cir. 1996); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 617 (3d Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1089 (6th Cir. 1996); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1302 (7th Cir. 1995); *Walsh v. Ford Motor Co.*, 257 U.S. App. D.C. 85, 807 F.2d 1000, 1010-11 (1986); *In re Citigroup, Inc.*, No. CIV.A.10011912REK, 2001 WL 1682865, at *3 (D. Mass. Dec. 19, 2001) (unpublished); *Hammett v. Am. Bankers Ins. Co.*, 203 F.R.D. 690, 700-02 (S.D. Fla. 2001); *Duncan v. Nw. Airlines, Inc.*, 203 F.R.D. 601, 605, 610-14 (W.D. Wash. 2001); *Neely v. Ethicon, Inc.*, No. 1:00-CV-00569, 2001 WL 1090204, at *8-11, *15 (E.D. Tex. Aug. 15, 2001) (unpublished); *Begley v. Acad. Life Ins.*

*Co.*, 200 F.R.D. 489, 497 (N.D. Ga. 2001); *Oxford v. Williams Cos.*, 137 F. Supp. 2d 756, 764 (E.D. Tex. 2001); *Jones v. Allercare, Inc.*, 203 F.R.D. 290, 308 (N.D. Ohio 2001); *Stipelcovich v. DirecTV, Inc.*, 129 F. Supp. 2d 989, 995 (E.D. Tex. 2001); *Shelley v. AmSouth Bank*, No. CIV.A.97-1170--RV-C, 2000 WL 1121778, at \*8-10, 2000 U.S. Dist. LEXIS 11429, at \*24-33 (S.D. Ala. July 24, 2000) (unpublished), *aff'd*, 247 F.3d 250 (11th Cir. 2001); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 220-23 (E.D. Pa. 2000); *Adams v. Kan. City Life Ins. Co.*, 192 F.R.D. 274, 277-78 (W.D. Mo. 2000); *Hallaba v. Worldcom Network Servs. Inc.*, 196 F.R.D. 630, 645 (N.D. Okla. 2000); *Velasquez v. Crown Life Ins. Co.*, No. CIV.A.M-97-064, 1999 WL 33305652, at \*4-7, 1999 U.S. Dist. LEXIS 13186, at \*10-22 (S.D. Tex. Aug. 10, 1999) (unpublished); *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 497-98, 503 (S.D. Ill. 1999); *Carpenter v. BMW of N. Am., Inc.*, No. CIV.A.99-CV-214, 1999 WL 415390, at \*4, \*8, 1999 U.S. Dist. LEXIS 9272, at \*12, \*23 (E.D. Pa. June 21, 1999); *Chilton Water Auth. v. Shell Oil Co.*, No. CIV.A.98-T-1452-N, 1999 WL 1628000, at \*8, 1999 U.S. Dist. LEXIS 21595, at \*26-27 (M.D. Ala. May 21, 1999) (unpublished); *Powers v. Gov't Emps. Ins. Co.*, 192 F.R.D. 313, 319-20 (S.D. Fla. 1998); *Rothwell v. Chubb Life Ins. Co. of Am.*, 191 F.R.D. 25, 33 n.7 (D.N.H. 1998); *Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520, 532-34 (N.D. Ill. 1998); *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 402-03 (D.N.J. 1998); *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 183 F.R.D. 217, 225 (W.D. Mich. 1998); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 465 (D.N.J. 1998); *Marascalco v. Int'l Computerized Orthokeratology Soc'y, Inc.*, 181 F.R.D. 331, 340-41 (N.D. Miss. 1998); *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 222-26 (E.D. La. 1998); *Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365, 368 (N.D. Ill. 1998); *Poe v. Sears, Roebuck & Co.*, 1 F. Supp. 2d 1472, 1476 (N.D. Ga. 1998); *Borskey v. Medtronics*, No. CIV.A.94-2302, 1998 WL 122602, at \*3, 1998 U.S. Dist. LEXIS 3732, at \*8 (E.D. La. Mar. 18, 1998) (unpublished); *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493, 496-99, 502 (N.D. Ill. 1998); *Peoples v. Am. Fid. Life Ins. Co.*, 176 F.R.D. 637, 646 (N.D. Fla. 1998); *In re Ford Motor Co.*

*Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 376 (E.D. La. 1997); *Clement v. Am. Honda Fin. Corp.*, 176 F.R.D. 15, 23 & nn.10-12 (D. Conn. 1997); *Dubose v. First Sec. Sav. Bank*, 183 F.R.D. 583, 587 (M.D. Ala. 1997); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 347-52 (D.N.J. 1997); *In re Stucco Litig.*, 175 F.R.D. 210, 219 (E.D.N.C. 1997); *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 100 (W.D. Mo. 1997); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 341-42 (N.D. Ill. 1997); *In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 422-27 (E.D. La. 1997); *Mack v. Gen. Motors Acceptance Corp.*, 169 F.R.D. 671, 679 (M.D. Ala. 1996); *Harding v. Tambrands Inc.*, 165 F.R.D. 623, 631-33 (D. Kan. 1996); *Barbarin v. Gen. Motors Corp.*, No. CIV.A.84-0888, 1993 WL 765821, at *3, 1993 U.S. Dist. LEXIS 20980, at *9-10 (D.D.C. Sept. 22, 1993) (unpublished); *Raye v. Medtronic Corp.*, 696 F. Supp. 1273, 1275 (D. Minn. 1988); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 608 (S.D.N.Y. 1982)).

¶16 Even where courts find that a nationwide, state-law governed class otherwise meets CR 23(a) and 23(b)(3) criteria, "the choice-of-law inquiry will ordinarily make or break certification." Ryan, *supra*, at 474. This is because if the laws of 50 jurisdictions apply to plaintiffs' claims, "the variations in the laws of the states . . . 'may swamp any common issues and defeat predominance.'" *Spence*, 227 F.3d at 311 (quoting *Castano*, 84 F.3d at 741); *see also Georgine*, 83 F.3d at 627 ("[B]ecause we must apply an individualized choice of law analysis to each plaintiff's claims, the proliferation of disparate factual and legal issues is compounded exponentially." (citation omitted)); *In re Am. Med. Sys., Inc.*, 75 F.3d at 1085 ("If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action.").

¶17 The choice of law provisions in this case will do more than cause variations in damages. The availability of the

voluntary payment doctrine in some states could abrogate AT&T's liability to customers in those states who voluntarily paid the UCC after receiving the informational flyer detailing their responsibility for its payment. This is only one example.

¶18 The Court of Appeals dismissed the trial court's concerns in part because it determined that "extrinsic evidence" "will not be necessary here because these consumers entered into a standardized contract." *Schnall*, 139 Wn. App. at 299-300. However, there is no support cited for this conclusion. Indeed, some Washington courts have held just the opposite: "When material extrinsic evidence shows that outside agreements were relied upon, those parol agreements should be given effect rather than allowing boilerplate 'to vitiate the manifest understanding of the parties.'" *Lopez v. Reynoso*, 129 Wn. App. 165, 173, 118 P.3d 398 (2005) (quoting *Lyall v. DeYoung*, 42 Wn. App. 252, 258, 711 P.2d 356 (1985)). Further, simply because the Court of Appeals finds extrinsic evidence would be unnecessary under Washington law does not mean that the law of all other 49 states would exclude such evidence as well.

¶19 An additional concern is the availability of affirmative defenses. As the trial court noted, "[s]ome states, such as Illinois, . . . allow as a contract claim defense, the voluntary payment doctrine which prohibits a contract claim for refund of a sum voluntarily paid." CP at 419-20 (Mem. Op. at 3-4) (citing *Smith v. Prime Cable of Chi.*, 276 Ill. App. 3d 843, 658 N.E.2d 1325, 213 Ill. Dec. 304 (1995)). The Court of Appeals suggested the trial court employ subclasses and master's hearings to sort out the morass. However, the availability of these mechanisms for efficient management of large class actions cannot change the predominance of the individualized issues in this case. *See* 2 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 4:32, at 286-87 (4th ed. 2002) (noting courts have found "subclasses would not cure the problems" of diverse factual issues and that "when a court determines that a multitude of mini-trials will be necessary to dispose of individual

claims, the court will likely find that common questions do not predominate"). As the trial court noted, "While Washington would be only one of fifty jurisdictions' law[s] which would have to be addressed in resolving the contract claims, it is illustrative of the issues that would arise." CP at 418 (Mem. Op. at 2).

Superiority Analysis

¶20 Even if individualized issues did not predominate, CR 23(b)(3) also requires "that a class action [be] *superior* to other available methods for the fair and efficient adjudication of the controversy." (Emphasis added.) *See also* 4 CONTE & NEWBERG, *supra*, § 13:11, at 406 ("It must be emphasized that, under the rule, a class action *must be superior, not just as good as*, other available methods." (emphasis added)). The superiority requirement "focuses upon a comparison of available alternatives." *Sitton v. State Farm Mut. Auto. Ins. Co.*, 116 Wn. App. 245, 256, 63 P.3d 198 (2003) (citing 1 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 4.27 (3d ed. 1992)).

¶21 In more traditional statewide class actions, these alternatives include joinder, intervention, or consolidation. *Id.* The most obvious alternative to the proposed nationwide class action in this case is numerous statewide class actions brought by the citizens of each state against AT&T. This is not a case where the choice is either a nationwide class action or no action at all. Miller & Crump, *supra*, at 71 ("Our analysis suggests that some of the problems of jurisdiction and choice of law could be solved by resort to statewide, as opposed to nationwide, class actions."). Given the sheer number of AT&T customers in each of the 50 states, no one state's citizens will be left out in the class action cold without the possibility of amassing enough individual claims within their state to cover litigation costs. *Cf. Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985) ("Class actions also may permit the plaintiffs to pool claims which would be uneco-

nomical to litigate individually. . . . [M]ost of the plaintiffs would have no realistic day in court if a class action were not available.").

¶22 Although it is true that small amounts of money are at issue and the decision will have broad impact, *Schnall*, 139 Wn. App. at 299, there is simply no efficiency in asking a trial judge to manage the laws of 50 different states as they apply to plaintiffs' contract claims and the varied factual scenarios inherent therein. *See* Miller & Crump, *supra*, at 64 ("Beyond the difficult task of correctly determining foreign law, the nationwide class action may present an even greater problem because of the sheer burden of organizing and following fifty or more different bodies of complex substantive principles. Although the comparison obviously is inexact, one can appreciate the magnitude of the trial judge's task by imagining a first-year law student who, instead of a course in contracts, is required simultaneously to enroll in fifty courses, each covering the contract law of a single state, and to apply each body of law correctly on the final examination." (footnote omitted)).

¶23 Further, Washington has limited interest in seeing telephone contracts executed by AT&T representatives in other states with citizens of those states examined and adjudicated in Washington courts. Our sister courts in other states are equally as prepared, if not better situated to apply the contract laws of their states. Our analysis might be different if AT&T was more significantly associated with Washington, but the trial court did not abuse its discretion by denying nationwide certification of the plaintiffs' contract claims. It does appear, however, that if the contract class were constructed as a statewide class, it would meet the requirements of both CR 23(a) and (b)(3).[4]

---

[4] Amicus curiae The American Legislative Exchange Council (ALEC) contends that it was error for the Court of Appeals to conclude that the CPA may be applied to a nationwide class, arguing among other things that by its terms the CPA does not apply extraterritorially. We note that in his amicus brief in support of Schnall's motion for reconsideration, the attorney general has provided us with credible reasons why ALEC's position does not reflect either the language or the policy of the CPA. However, we need not reach this issue because we hold that a nationwide

### Remaining Washington Plaintiffs' CPA Claims

¶24 The trial court declined statewide class certification of the plaintiffs' CPA claims on the grounds that each plaintiff would have to prove that AT&T's allegedly false or deceptive advertising and billing practices caused his or her injury. "This proof must necessarily be individual for each potential class member." CP at 421-22 (Mem. Op. at 5); *see also Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 785, 719 P.2d 531 (1986) (requiring CPA plaintiffs to establish a causal link "between the unfair or deceptive act complained of and the injury suffered"). The trial court found that each plaintiff would have to show individual reliance, making class certification inappropriate. CP at 422. Unfortunately, the trial court did not have the benefit of our recent opinion in *Indoor Billboard / Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wn.2d 59, 82, 170 P.3d 10 (2007), where we firmly rejected the principle that reliance is necessarily an element of the plaintiff's case. Instead:

> We conclude where a defendant has engaged in an unfair or deceptive act or practice, and there has been an affirmative misrepresentation of fact, our case law establishes that there must be some demonstration of a causal link between misrepresentation and the plaintiff's injury. Indoor Billboard urges us to adopt a per se rule and hold that payment of Integra's invoice is per se sufficient to establish the proximate cause of plaintiff's damages. We reject Indoor Billboard's per se rule because mere payment of an invoice may not establish a causal connection between the unfair or deceptive act or practice and plaintiff's damages. Proximate cause is a factual question to be decided by the trier of fact. Payment of an invoice may or may not be sufficient to establish a causal connection between the misrepresentation of fact and damages, but payment of the invoice may be considered with all other relevant evidence on the issue of proximate cause.

class action under CR 23 cannot be maintained in this case. Moreover, we generally do not address issues raised only by amicus and decline to do so here. *See Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 819, 225 P.3d 213 (2009).

We hold that the proximate cause standard embodied in WPI 15.01 [6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 15.01, at 181 (5th ed. 2005)] is required to establish the causation element in a CPA claim. A plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury.

*Id.* at 83-84. More specifically, WPI 15.01 provides that "[t]he term 'proximate cause' means a cause which in a direct sequence [unbroken by any new independent cause,] produces the [injury] [event] complained of and without which such [injury] [event] would not have happened. [There may be more than one proximate cause of an [injury] [event].]" WPI 15.01, at 181 (most alterations in original). Similarly, under WPI 310.07, the plaintiff has the burden of showing "a cause which in direct sequence [unbroken by any new independent cause] produces the injury complained of without which such injury would not have happened. [There may be more than one proximate cause of an injury.]" 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 310.07, at 274 (5th ed. 2005) (alteration in original). The plaintiff must merely show that the "injury complained of . . . would not have happened" if not for defendant's violative acts. *Indoor Billboard*, 162 Wn.2d at 82.

¶25 After we established that WPI 15.01 sets forth the appropriate standard for the causation element of a private CPA action based on an affirmative misrepresentation of fact, we considered application of the WPI 15.01's "but for" causation standard. The plaintiff in *Indoor Billboard* was a business customer, Indoor Billboard/Washington Inc., who complained that the defendant, Integra Telecom of Washington Inc., a competitive telecommunications company, engaged in an unfair or deceptive act in violation of the CPA in both charging and collecting a surcharge it described as a presubscribed interexchange carrier charge (PICC). James Shulevitz, a vice president of Indoor Billboard, questioned the charge and conducted some independent research, but authorized payments of invoices with the PICC surcharge. *Indoor Billboard*, 162 Wn.2d at 66-67.

¶26 We concluded that "Integra engaged in an unfair or deceptive act or practice as a matter of law when it labeled the surcharge it imposed on local business customers a PICC" because use of this term "had the capacity to deceive a substantial portion of the public into thinking the surcharge was . . . regulated and required" by the FCC, although it was not. *Id.* at 78.

¶27 We addressed proof of the causation element as follows:

> b.   Are there genuine issues of material fact regarding a causal link between Integra's unfair or deceptive act or practice and Indoor Billboard's injury, precluding summary judgment for Integra?

Although its primary argument is that it need only show that it paid Integra's invoice to demonstrate causation, Indoor Billboard alternatively argues that the evidence of record is sufficient to establish genuine issues of material fact regarding causation to submit the question to a jury. Indoor Billboard points primarily to Shulevitz's deposition testimony that he relied on and was confused by information provided by Integra in deciding to purchase Integra's services. Indoor Billboard argues that Shulevitz paid the invoice only because he was "reluctant to contest a charge on his very first bill at the start of a multi-year contractual relationship." Br. of Appellant at 45. It further argues that Shulevitz's actions did not break the causal link between Integra's unfair or deceptive act or practice and Indoor Billboard's injury because the research was only necessary to dispel Shulevitz's confusion and the question should more properly be decided by a jury.

Integra maintains that Shulevitz knew that Integra's PICC was unrelated to the FCC before it signed the agreement for Integra's services. Integra asserts Shulevitz knew the PICC was charged to all customers regardless of whether they received interexchange services from Integra and that the PICC was set by the company rather than the FCC. Further, Integra argues that Indoor Billboard did not challenge Integra's PICC until after it had received the first invoice, even though it could have chosen not to purchase Integra's services in the first place. Lastly, Integra argues that Indoor Billboard

based its decision to challenge Integra's PICC on information it obtained primarily from external sources—not from Integra.

We conclude it is not clear whether Integra's actions caused Indoor Billboard's injuries or whether Indoor Billboard's injuries were the result of its reliance on information it obtained from Shulevitz's investigation, as in *Nuttall* [*v. Dowell*, 31 Wn. App. 98, 639 P.2d 832 (1982)]. The evidence in the record is sufficient to demonstrate that genuine issues of material fact exist regarding a causal link between Integra's unfair or deceptive acts or practices and Indoor Billboard's injuries. We hold that summary judgment was inappropriate and remand the matter for trial.

*Id.* at 83-85.

¶28 Here, the trial court did not analyze the causality element of plaintiffs' CPA claims under the "but for" standard of proximate causation under WPI 15.01, as subsequently adopted in *Indoor Billboard*. Further, the trial court did not consider proof of causation only with regard to the facts and evidence pertaining to a Washington class action. Instead, the trial court considered proof of causation in the context of a nationwide suit and with regard to whether such proof would necessarily be individual for each member of the class, rendering a class action unmanageable because individual issues would predominate over class issues. CP at 422 (Mem. Op. at 6) ("In the context of this case, each plaintiff must show that [AT&T's] alleged misrepresentation about the plaintiff's obligation to pay a UCC affected the plaintiff's decision to choose [AT&T] as a wireless provider."). It also overemphasized the importance of reliance as a component of causation. Accordingly, we remand for further consideration of this issue in accordance with our opinion.

¶29 In sum, we agree with the trial court that this action should not be certified as a *nation*wide class action. A nationwide class action would be unmanageable and unduly burdensome on the trial court and the state judicial system and serve no real benefit to plaintiffs who are free to bring statewide class actions in their home states. We

reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.

C. JOHNSON, ALEXANDER, FAIRHURST, and J.M. JOHNSON, JJ., concur.

¶30 CHAMBERS, J. (concurring in part/dissenting in part) — I concur with the dissent that the trial court abused its discretion by determining that a nationwide class was not feasible without first considering whether state law differences could be managed by subclasses and special masters. I also concur that Washington "has a substantial interest in assuring Washington corporations conduct business in a fair and honest manner [and] to provide a forum to resolve the legal issues of Washington businesses," which weighs heavily in favor of nationwide class certification. Dissent at 287. I concur with the majority, however, that the proximate cause standard of WPI 15.01 is the proper analytical device to determine whether the defendant's wrongful conduct caused the plaintiffs' injury. 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 15.01, at 185 (5th ed. 2005). I concur with my colleagues in both majority and dissent that the Consumer Protection Act, chapter 19.86 RCW, claims must be remanded to the trial court for reconsideration in light of *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wn.2d 59, 82, 170 P.3d 10 (2007).

¶31 SANDERS, J.[*] (dissenting) — Because the trial court abused its discretion when it denied nationwide class certification absent a sufficient analysis of the feasibility of such a class, I dissent.

¶32 This court reviews a trial court's class certification ruling for abuse of discretion. *Smith v. Behr Process Corp.*, 113 Wn. App. 306, 318, 54 P.3d 665 (2002). A discretionary decision will not be disturbed unless it is based on untenable grounds or is manifestly unreasonable or arbitrary.

[*] Justice Richard Sanders is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

*Oda v. State*, 111 Wn. App. 79, 91, 44 P.3d 8 (2002). To certify a class, a trial court must find numerosity, commonality, typicality, and adequacy of representation. CR 23(a); *Smith*, 113 Wn. App. at 319. The court must also find (1) that there is a risk of inconsistent results on individual claims resulting in inconsistent standards of conduct or the possibility of a preclusive effect on other class members, *or* (2) that injunctive or declaratory relief is appropriate for the class as a whole, *or* (3) that common questions of law or fact predominate. CR 23(b); *Smith*, 113 Wn. App. at 321-22.

¶33 The trial court denied class certification because it reasoned the contract claims would be unmanageable (lacking commonality, typicality, and predominance of common questions) because 50 different state laws would need to be applied in order to interpret contract provisions and apply affirmative defenses, Clerk's Papers (CP) at 617-19 (Mem. Op. Den. Mot. for Class Certification (Mem. Op.) at 2-4); and Washington's Consumer Protection Act (CPA), chapter 19.86 RCW, applied nationwide but each individual would need to prove causation—that the alleged misrepresentation affected his or her decision to choose AT&T[5] as a wireless provider—and therefore individual issues predominated over class issues, CP at 619-21 (Mem. Op. at 4-6).

¶34 The Court of Appeals reversed, reasoning the contract claims all shared a common legal theory, any differences could be resolved through subclasses and master's hearings, and the CPA claims could be litigated nationwide and causation could be proved by means other than individual reliance. *Schnall v. AT&T Wireless Servs., Inc.*, 139 Wn. App. 280, 289, 290-92, 161 P.3d 395 (2007), *review granted*, 163 Wn.2d 1022, 185 P.3d 1194 (2008).

¶35 The majority reverses the decision of the Court of Appeals, largely following the trial court's decision, reasoning the contract claims require application of individual state laws and thus do not satisfy the predominance requirement for class certification, majority at 269-76, and

---

[5] AT&T Wireless Services Inc.

the CPA claims cannot be certified for a class action because the general class issues do not predominate over individual ones where the trial court must make individual determinations of reliance, *id.* at 277-80.

¶36 I dissent. As recognized by the Court of Appeals, subclasses and master's hearings could be used to address differing state contract laws. Not every state contract law is materially different for purposes here, and the trial court abused its discretion by failing to consider whether the laws of the states could be grouped together in a manageable number of subclasses. I agree with the trial court and Court of Appeals that the Washington CPA can be applied nation-wide. The CPA and CR 23 (governing class certification) are intended to be liberally construed to provide the class a forum to litigate against the conduct alleged here—a corporation nickel and diming consumers wholesale.

¶37 For the sake of clarity I generally follow the headings used in the majority.[6]

### Enforceability of choice of law provisions

¶38 The majority concludes that the choice of law clauses in the individual customers' contracts should be enforced. The majority's analysis appears to address only the contract claims and not the CPA ones. Majority at 266-69. I concur with the application of the choice of law clauses to the contract claims. As explained more fully below, however, this application of different state contract laws does not

---

[6] Although one of the grounds upon which we granted review was federal preemption, the majority does not address that issue—but since the majority concludes that a Washington-only CPA class may survive, it tacitly rejects the preemption argument. There is no federal preemption here. The CPA does not preclude AT&T from billing its customers for contributions to the Universal Service Fund (which would be preempted), but rather precludes AT&T from doing so through misrepresentation or a failure to disclose the true nature of the charge (a matter of generally applicable state consumer protection). *See In re Truth-in-Billing & Billing Format*, 20 F.C.C.R. 6448, 6450 (2005) ("[N]o action we propose will limit states' ability to enforce their own generally applicable consumer protection laws."), *vacated on other grounds sub nom. Nat'l Ass'n of State Util. Consumer Advocates v. Fed. Commc'ns Comm'n*, 457 F.3d 1238, *modified*, 468 F.3d 1272 (11th Cir. 2006).

necessarily defeat class certification because subclasses and other mechanisms could likely be used to address any variances.

¶39 The choice of law clauses do not apply to the CPA claims.[7] The CPA claims are based upon statute, not contract, and many of the claims arose *before* the class members even entered into their contracts with AT&T pertaining to choice of law. The first element of a CPA action—an unfair or deceptive act—can arise prior to a contract; a litigant need only show an act "had the capacity to deceive a substantial portion of the public." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 785, 719 P.2d 531 (1986) (emphasis omitted).[8] That is the case here where the CPA claims relate to the use of allegedly deceptive language, advertising, and promotional materials.

Class certification of contract claims

¶40 The majority endorses the trial court's view that individual issues predominate over the common legal and factual issues due to the "interpretation of the contract terms" and "the availability of differing affirmative defenses" under the laws of 50 different states. Majority at 270-71. The trial court listed potential differences in contract interpretation, the voluntary payment doctrine, and the interpretation of arbitration agreements as examples of where the claims would need to be analyzed under 50

---

[7] I can only assume that the majority, silent on this issue, majority at 266-69, does not find the choice of law clauses applicable to the CPA claims.

[8] A litigant can make such a showing even prior to suffering an injury because the CPA not only vindicates individual rights but also protects the public interest. *See Scott v. Cingular Wireless*, 160 Wn.2d 843, 853, 161 P.3d 1000 (2007); *Hangman Ridge*, 105 Wn.2d at 785 ("The purpose of the capacity-to-deceive test is to deter deceptive conduct *before* injury occurs." (citing Jeffrey M. Koontz, Recent Development, *Washington Lawyers Under the Purview of the State Consumer Protection Act—the "Entrepreneurial Aspects" Solution*—Short v. Demopolis, *103 Wn.2d 52, 691 P.2d 163 (1984)*, 60 WASH. L. REV. 925, 944 (1985))). This protection of the public interest extends to misrepresentations made to one person, where those misrepresentations have the capacity to deceive a substantial portion of the public—for example, if they are made in a standard form contract. *See, e.g., Potter v. Wilbur-Ellis Co.*, 62 Wn. App. 318, 327-28, 814 P.2d 670 (1991).

different state laws. However, not *every* law of the 50 states has a different approach to contract interpretation and affirmative defenses. Where state laws materially differ, subclasses could be established to address those differences. *See Sitton v. State Farm Mut. Auto. Ins. Co.*, 116 Wn. App. 245, 255, 63 P.3d 198 (2003) ("courts have a variety of procedural options to reduce the burden of resolving individual damage issues, including bifurcated trials, use of subclasses or masters, [or] pilot or test cases with selected class members"); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 468 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998).[9]

¶41 The trial court abused its discretion by failing to determine whether the laws of the states could be separated into a few, manageable subclasses. The trial court referenced only speculative differences in the law of every state without determining whether material differences actually existed in each. I would therefore remand this issue to provide the parties an opportunity to further brief, and the trial court to fully consider, whether subclasses could be created to address materially different state laws within a nationwide class.

## Superiority analysis

¶42 CR 23(b)(3) requires a court to find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The majority concludes that a nationwide class action is not superior to other available methods—namely, that individual state class actions are better suited to resolve the controversy. Majority at 275-76. However, the majority's reasoning does not support this conclusion.

---

[9] The majority cites over 50 cases in which federal courts declined to certify a class based on Fed. R. Civ. P. 23 where multiple state laws applied. Majority at 271-73. But this list of cases, devoid of detail or discussion, merely supports the obvious proposition that under some facts, application of numerous state laws can defeat class certification. There is no need to counter in kind to cite to the equally obvious corollary—that under some facts the potential application of multiple state laws can be managed and class certification *is* warranted.

¶43 First, the majority asserts that, although class actions permit claims involving small amounts of money to be brought to court, this does not weigh in favor of a nationwide class because there are enough AT&T customers to bring 50 individual statewide class actions.[10] *See id.* This ignores the significant advantages of a nationwide suit. The claims in every state involve the nature of the universal connectivity charge (UCC), an apparent nationwide approach to charging fees in relation to the UCC, omissions or the same or similar misrepresentations to further that approach, and the same defendant corporation. A nationwide suit avoids a 50-fold redundancy of litigation, which will substantially increase the costs of the litigation to both parties, particularly attorney fees; result in redundant discovery, including repetitive document production and depositions; result in redundant relitigation of the same issues; and saddle the judiciary of all 50 states with significant costs to redundantly try statewide class actions based on the actions of a single Washington corporation.

¶44 Next, the majority claims it would be inefficient to have a trial judge manage a claim litigated under 50 different state laws. *Id.* at 276. As more fully discussed *infra*, the law of all 50 states will not conflict and, as recognized by the Court of Appeals, *see Schnall*, 139 Wn. App. at 299, subclasses and master's hearings can be used to address subsets of class members. The trial court abused its discretion, asserting a nationwide class would be unmanageable without analyzing the extent to which the state laws are materially similar and can be grouped into multistate subclasses.

¶45 Finally, the majority asserts Washington has no interest in having claims against a Washington corporation litigated in this state if they involve customers from other states. Majority at 276. But as later discussed in more

---

[10] The majority provides no basis for its insinuation that a class is waiting in every state to file a statewide class action now that the majority is dissolving the nationwide class action here. A nationwide class provides no risk that the consumers of any states will be left behind.

detail, Washington has a substantial interest in assuring Washington corporations conduct business in a fair and honest manner. Washington also has a substantial interest to provide a forum to resolve the legal issues of Washington businesses.

¶46 Pending a determination that the contract laws of the 50 states do not materially differ from one another so as to preclude a manageable number of subclasses to address those differences, a nationwide class is the most efficient, economical, and reliable way to assure that every class member is provided a forum in which to bring his or her claim.

"Extraterritorial" application of Washington's CPA

¶47 Holding that a nationwide class cannot be maintained in this case, the majority does not reach the issue of the CPA's extraterritorial application. Majority at 276 n.4. Because I would hold that a class could be maintained, a brief discussion of the CPA's application is warranted.

¶48 The trial court and the Court of Appeals agreed that the Washington CPA was applicable to the nationwide class because AT&T is headquartered in Redmond, Washington. Washington regulates the behavior of Washington businesses; the purpose of the CPA is not only to protect the public *from* unfair and deceptive acts, but also to "foster fair and honest competition" among businesses. RCW 19.86.920. If a Washington business is acting in an unfair or dishonest way nationwide, Washington has a strong interest to address the full, nationwide effects of that behavior; Washington should not become a harbor for businesses engaging in unscrupulous practices out of state. *See Hangman Ridge*, 105 Wn.2d at 785 (" 'The CPA, on its face, shows a carefully drafted attempt to bring within its reaches *every* person who conducts unfair or deceptive acts or practices in *any* trade or commerce.' " (quoting *Short v. Demopolis*, 103 Wn.2d 52, 61, 691 P.2d 163 (1984))). At least one party—AT&T—is native to Washington in every transaction here.

The transactions involve AT&T's formulation of its representations,[11] the approval and distribution of those representations, and the offer and acceptance of the agreements.[12] Significant portions of each transaction occurred in Washington.[13]

¶49 The statutory language of the CPA applies to transactions between a Washington party and an out-of-state party in two ways here. RCW 19.86.020 requires that the "[u]nfair methods of competition and unfair or deceptive acts or practices" must be "in the conduct of any trade or *commerce*." (Emphasis added.) "Commerce" under the CPA is described as "any commerce directly or indirectly affecting the *people* of the state of Washington." RCW 19.86.010(2) (emphasis added). "Person" is defined to include "natural persons, *corporations*, trusts, unincorporated associations and partnerships." RCW 19.86.010(1) (emphasis added). Thus, the transaction here is "commerce" that "directly . . . affect[s]" AT&T, a corporation headquartered in Washington and thus a "person" under the CPA. The CPA therefore applies.

¶50 Furthermore, RCW 19.86.010(2) also encompasses commerce that *indirectly* affects the people of the state of Washington. AT&T's exchange of goods and services with individuals outside the state of Washington is still commerce that indirectly affects Washingtonians. First, the Washington employees of AT&T are "natural persons," RCW 19.86.010(1), and AT&T's commerce with the claimants indirectly affects the nature and availability of their employment. Second, to the extent "the people of the state of

---

[11] These representations include those made in advertising and discussions prior to the contract, those made in the contract, and those made postcontract in response to customer inquiries.

[12] To the extent AT&T branch offices in other states offered and accepted the contracts with customers, the AT&T headquarters would have provided them the authority to do so under the representations and omissions challenged here.

[13] The CPA claims also include allegations of omissions. To the extent AT&T decided to omit information or failed to provide information it should have to consumers, those decisions or oversights would be attributable to decisions made at AT&T's headquarters in Washington.

Washington," RCW 19.86.010(2), is read as a broader appeal to the public interest, the commerce and trade AT&T brings into Washington, and the alleged unfair and dishonest method by which it does so, affects the state economy and thus affects the Washington public at large.

¶51 The transactions here, between a Washington resident and out-of-state customers, originating at least in part in this state, fall well within the jurisdictional boundaries of the CPA.[14] The CPA encompasses the nationwide class action proposed here.

### Remaining Washington plaintiffs' CPA claims

¶52 To prevail on a private CPA claim, a plaintiff must (1) show that the defendant engaged in an unfair or deceptive act or practice (2) in trade or commerce (3) that affects the public interest (4) and injured the plaintiff's business or property, and (5) show that there is a causal link between the unfair or deceptive act and the injury suffered. *Indoor Billboard / Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 74, 170 P.3d 10 (2007) (citing *Hangman Ridge*, 105 Wn.2d at 784-85). The fifth requirement, causation, is at issue here.

¶53 Causation "is a factual question to be decided by the trier of fact." *Id.* at 83. A plaintiff is not limited in how he or she can prove causation, as long as there is "some demonstration of a causal link between the misrepresentation and the plaintiff's injury." *Id.* In *Indoor Billboard* this court rejected the notion that payment of an invoice that contained a misrepresentation or omission was automatically sufficient evidence to establish causation; however, we recognized that such a payment, when considered with all relevant evidence, could be sufficient. *Id.* at 83-84.

¶54 That is the case here, where payment in combination with the whole of the evidence *is* sufficient to establish

---

[14] Although the statutory language here is clear, any ambiguity would be liberally resolved with a construction that effectuates the CPA's purposes, including the fostering of fair and honest competition. *See* RCW 19.86.920.

causation. The class members agreed to pay AT&T a certain amount for services; AT&T charged more than that amount; AT&T misrepresented that the excess charges were imposed by the federal government on the consumer; those charges were not imposed by the federal government on the consumer; and the class members paid the excess charges.[15] A trier of fact could make the commonsense inference that people do not willingly pay more money for commercial services than they must and, in particular, more than they originally agreed. People do, however, expect to be taxed; AT&T's misrepresentation of the fee as a mandatory federal tax on consumers causes class members to pay the "tax." Payment of the UCC in light of the nature of the misrepresentation and reasonable inferences drawn from common sense provides a sufficient basis for a trier of fact to find causation, as envisioned in *Indoor Billboard*. *See id.* at 84.

¶55 Here, the surrounding facts provide a basis for a causal connection. Class members, after entering into a contract with AT&T at a certain price, would not have rationally intended to pay more without a valid justification for the additional charge. A trier of fact could draw the inference that individuals were motivated by the most obvious source—a belief that the charge was a mandatory federal tax on consumers. *Cf. Hangman Ridge*, 105 Wn.2d at 795 (where this court made a similar distinction between fact sets, comparing those in *Hangman Ridge*—where causation was not established due to causal gaps—to those in our decision in *Bowers v. Transamerica Title Insurance Co.*, 100 Wn.2d 581, 590, 675 P.2d 193 (1983)—where the causal link was sufficiently established with reasonable inferences concerning the plaintiff's behavior).

¶56 This court liberally construes CR 23 and the CPA to effectuate their purposes. *See Scott v. Cingular Wireless*, 160 Wn.2d 843, 857, 161 P.3d 1000 (2007) (" ' "[T]he interests of justice require that in a doubtful case . . . any error,

---

[15] The trial court must take the plaintiffs' substantive allegations as true for the purpose of class certification. *See Cingular Wireless*, 160 Wn.2d at 856-57 (quoting *Smith*, 113 Wn. App. at 318-19).

if there is to be one, should be committed in favor of allowing the class action." ' " (second alteration in original) (quoting *Smith*, 113 Wn. App. at 319 (quoting *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968)))); *Dix v. ICT Grp., Inc.*, 160 Wn.2d 826, 161 P.3d 1016 (2007); *see also* RCW 19.86.920. The CPA permits private citizens to act as private attorneys general to protect the public interest against unfair and deceptive practices. *See Cingular Wireless*, 160 Wn.2d at 851-53. Any requirement that class members individually prove reliance precludes the CPA from sufficiently protecting the public if a corporation misrepresents its charges or services to the public. Under the facts and circumstances of this case, a sufficient causal link exists to certify the class.

## California class

¶57 Since the filing of the nationwide class action in Washington, a separate state class action has been filed in California. The nationwide class has moved to amend so as to exclude the California class from the Washington litigation. The trial court should determine on remand whether the plaintiffs can exclude the California consumers, resolve reportedly inconsistent arguments concerning which state consumer protection law should apply, and avoid conflicts of interest among counsel.

## Conclusion

¶58 The majority errs by holding the trial court did not abuse its discretion to decline certification of a nationwide class without first considering whether subclasses or master's hearings could be used to address potential material conflicts among state contract laws. I would remand the nationwide class certification issue to the trial court for reconsideration in light of the discussion here.

OWENS and STEPHENS, JJ., concur with SANDERS, J. PRO TEM.

Reconsideration denied February 17, 2011.